Thank you, Your Honor. May it please the Court, Counsel, we are brought here today on a motion to dismiss that was successful in the middle of my trial in July of 2017. It dealt with Mr. Wise's case that turns on his use of unsupplemented prednisone, and our complaint is that it should have been supplemented, and it makes a difference. As a result of not being supplemented, he L-1, L-2, and L-4. The evidence that we would have presented and did offer by way of a Rule 26 and would have had the case continued is that when you're using prednisone in any significant amount over any appreciable time, it has to be supplemented. If you don't do that, the difficulty is that you wind up with bone depletion. What the prednisone does is to deplete the limit that, and in fact to aid bony formation, and that's the purpose of the supplementation. If you go a significant time period, which in this case it was, and do not have the supplementation, you're going to wind up with the fractures that developed. The nub of the case was this, that we had a physician from Harvard in endocrinology who was going to testify about the standard of care, saying that it was required that you supplement after you go a certain period of time. Not supplementing made a difference and produced the compression fractures. Another expert in the case testified, these are permanent injuries, he needs lifetime care and the special damages up to the time of the trial were about $112,000. We maintain that in August of 2011, the standard required that you supplement when you give the prednisone. It's done by bisphosphonates, by vitamin D and calcium that are given as well at that time. The initial dose was 15 milligrams a day for this fellow. By two weeks from then, November 9 of 2011, I'm sorry, September 9 of 2011, he was up to 50 a day. 50 a day is a big dose for a fellow who is near 50 years of age. Effectively, he saw the doctor one time and he was going to see him again after August 26, the next time on December 28 of 2011. In the meantime, he was on prescriptions for 50 milligrams a day. Essentially, that would mean the passage of about 100 days that would intervene between September 9 when he began the 50 milligrams a day and the first fracture that was diagnosed on December 19 of 2011, resulting in compressions at T12 and L1. But is the expertise that we're talking about a judgment call on that extended period of what can happen, the result of the lack of supplementation? But the district court seemed to focus on the idea that he didn't have experience in treating sort of the front end of this. That was addressed, I think, in a brief and I talked about front end and back end, that kind of thing. The endocrinology fellow, Dr. Rosen, who testified is very expert in the you wind up with a problem. And the evidence that we presented was that the increase of fracture risk grows markedly with the amount and the timing of the doses that you give. You get beyond 20 milligrams, you're going to have a problem. He was on 50 milligrams for a long period of time, for a four-month period of time. Now, the question that the judge posed twice to me was, well, don't you have to have a supplementation? The criticism we offer is not with regard to history, not with regard to physical examination, not with regard to the assessment, but the plan. And the plan involved the use of prednisone, but not to supplement the prednisone, which was required. So it wasn't theoretical. It wasn't a judgment call, Your Honor. And we should have had the opportunity to put that evidence in. And this is a residue of not having supplementation. And we think that's why it has to occur. Because under the Minnesota law, the one part of the standard for admission of, or competency of an expert is the extent of the witness's practical experience with the matter that's the subject of the offered testimony. So that's, isn't that really sort of where we're swimming around here, trying to figure out what is the matter that's the subject? You're saying the matter of the subject is, how would you define it? The unsupplemented provision of prednisone over a long period of time. So we'd gone through the history, the physical exam, the assessment, okay. Now we've turned to the issue of how do you do that? How do you plan that? What's the treatment of that? When you get involved in doing the prednisone, that's how Dr. Rosen becomes relevant to that. And he can testify with respect to that. Got nothing to do with seeing the patient and seeing if it's R3 PE, if it's polymyalgia rheumatic or anything like that. It is. Once you have made a decision to give the prednisone, how do you do it safely? And this was an unsafe use of the prednisone, respectfully, your honor. You can't not supplement for this long a period of time. If you do, you wind up with a position that Mr. Wise had with four compression fractures. It's not so much even a front and back end thing. It's the fact that, you know, particular types of patients may have different requirements. So somebody who is a rheumatology patient and put on prednisone may have different, present different difficulties than somebody who's a gastroenterology patient. And so it may be perfectly fine to do unsupplemented prednisone in one instance, but not the other. And you didn't have any evidence from what I can tell about a, from a doctor who treats patients presenting with those particular difficulties. Why isn't that a problem for you? I don't think I need to have a rheumatologist, your honor. And I had an endocrinologist who knows about when it is that you decide to use a prednisone, how do you go about doing it? It doesn't matter in whose hands it is. It is when you do it, you have to be careful about dose and timing and you wind up needing to supplement. It's not a matter of Christian Wise having these three differential diagnoses. It is once you decide upon prednisone, how do you do it appropriately? So in that circumstance, it's not calling for a rheumatology person to testify about that. But what does Dr. Rosen know about that? I mean, he writes an awful lot. He's published a lot. He prescribes prednisone. He treats patients who have osteoporosis. He's run the clinic at Harvard for 20 years. He's lectured to people in rheumatology about six different years regularly on how safely to do it. So the question, your honor, is not in whose hands it is. It's when you do it with the prednisone, what must you do to do it safely? It doesn't matter who's here. Pardon me? Right. That standard of care. Yes. He was he was offered as a standard of care witness. Yes. Yes. But the problem or an issue that I see that that just jumps out is that when he was asked if he had practical knowledge of what is usually and customarily done by physicians under the circumstances similar to those of Mr. Wise in 2011, seeing Dr. Osborne, he said that he didn't. Right. And that's how you get. Sure. Thank you, your honor. That's addressing how it is you attack this rheumatology problem. Having addressed or identified which you believe the problem to be in one of. How do you go about doing it? You do it by means of the prednisone. If you do do that, then you have to supplement that. That's where the narrow part of the testimony and the entire case was about. When you begin to supplement, I'm sorry, when you begin to use prednisone, you must supplement. Absent that, you run a real risk for the patient. Now, to me, this is analogous to the Kornfeld case, and that's where your honors are pointing to that case of 262 Northwest Second. And in that case, the trial court said the internist couldn't testify about the suitability of the patient for surgery because he wasn't a surgeon. So you don't have to be a surgeon to render that diagnosis from the state Supreme Court. That gastroenterologist internist had the ability, knowledge, and experience to comment on what person is suitable for surgery or not. Don't have to be a surgeon. Don't have to be a rheumatologist. Don't have to be a proctologist. Don't have to be an internist to know how safely to give the prednisone. And that's where Dr. Rosen has the expertise. And he lectures people frequently in that What about just the idea of treating sort of the variations of the different circumstances that come to a doctor, and that's a tough call on what exactly they should be doing? I'm sorry. Did I interrupt you? It's not a question about the differential. It's a question about when you prescribe the medicine for the differential, what must you do? And if you do the prednisone, you may not give that bear, which is what happened here. So we're dicing out what it is that he has and how he presents and that kind of thing. It's into the area of what's the risk involved in doing the prednisone. And when you consider there's virtually no risk in the bisphosphonates, there's no cause not to do it. So in answer to your question, Your Honor, we're to the point of now I'm going to do it. How do I do it safely? Which doesn't require a rheumatologist to do that. And it doesn't matter if it's the gynecologist, the family practitioner, or whatever. If you do do that, you have to supplement to do it safely. Because when you get to 30 milligrams for three to four months on a daily basis, that's a real problem for a patient. It seems to me that the Minnesota Supreme Court and Minnesota law draws a distinction between people who have practical experience treating particular patients and those that do not. Doesn't that make sense from one perspective, which is the theoretical is going to be different than the practical. And it would be different in this case, for example, if your expert witness had experience consulting on rheumatology patients. So there was some sort of practical knowledge about the standard of care, as Judge Shepard mentioned. Doesn't that sort of separate this from some of the cases that are cited in the briefs? I don't think it does, Your Honor. And if you look at the CV, which is part of my addendum, he did the grand rounds for rheumatology in the years of 2006, 8, 9, 12, 13, 15, regularly consulting with rheumatologists at Harvard about how you do this. So the question in this case, I think, is really like the one in that Kornfeld case at 262 Northwest 2nd. And the site I would call your attention to is 693 and 694, where it talks about the fact that you don't have to be in that particular specialty to be an expert to render the opinion. The issue here is not rheumatology. The issue is the safe use of prednisone. It's that simple, Your Honor. And I think as the trial court said on two occasions, and I think it was 301 and 307 of the transcript of Document 81, doesn't this really go to the question of weight? I think it does. And when we're talking about this prednisone that's being done in a case like this, it doesn't matter whose hands. It matters when you do it, how do you do it safely? And that requires the bisphosphonate supplementation. So what do you think the standard of review is here on this issue? The standard is, was there an error on the evidence or an erroneous exercise of discretion? And I think there's an error on both counts. We had evidence to indicate that the underlying belief of Dr. Osborne that it would take a year to have a problem with osteoporosis by unsupplemented prednisone. Wrong. It would take a year for bisphosphonates to work. Wrong. No need to monitor. Wrong. Which led to his belief and follow to give the unsupplemented prednisone in this case. So the standard is abusive discretion and or the issue of wrong on the evidence. And it's wrong on the evidence. What is wrong on the evidence? Well, the evidence in the case, according to Kornfeld, is that you have to have a scientific background. Probably no question about that. Practical experience. And the practical experience here lies in the area of the use of the prednisone. Not the rheumatology part, but the piece when it is that you use the prednisone, how do you do that carefully? That's what this case is about. Not does he have RS3PE, polymyalgia, that kind of thing. But he does consult with rheumatologists all the time and teaches people in that area. So respectfully, Your Honor, I think we've met that test. And I really would commend that Kornfeld on Dr. Belcito with regard to the internist testifying to surgery standards of care. Please. Let me just ask one additional follow up. You know, you might have the right legal argument if we extended the law. I think there's a lot of merit to your position. But ultimately, this gets back to what Judge Shepard was asking about, which is the abuse of discretion. I mean, it was a call for the district court to make. And even if I would have made a different call, that doesn't mean that the district court abuses discretion in making the call that it did. And so I'm wondering what your response to that is. My response is, please take a look at Dr. Belcito and Kornfeld, because I think it's not so simple to say that you have to be a rheumatologist to render testimony in a case like this. And it's not a leap to say that when you give the prednisone, you have to be careful about that. This was an uncareful use of the prednisone in whosoever hands it happened to be done. That's the position I maintain, which is a simple one and not esoteric. It doesn't matter in what particular area you are. It means that if you use that, be careful to supplement, because if you don't, you're going to have this problem. So I don't respectfully think that's an extension of the law. And if you look at Dr. Belcito and look at the Kornfeld case, that's exactly where we are. Though she said, I'm not saying he can't testify because he's not a rheumatologist, effectively, that's what she determined in that case. So if you look at that page, it's 693 and 694. It really addresses that, Your Honor, a piece, because that's a 1977 case, respectfully. Thank you. Counsel? If it pleases the court, my name is Bill Starry. I represent the defendant, Mayo Clinic. I'm here with the in-house counsel for Mayo, Matt Hansel. Let me ask this before you really get started. What's the standard of review here? Abuse of discretion. Now, what does that mean? That means if the trial court has... With an evidentiary ruling like this, what does abuse of discretion mean? I would argue it means if there is a rational basis for the trial court, if there can be seen a basis for the trial court's exercise of discretion, then whether or not this court would have reached the same conclusion, if there's a rational basis for the trial court, it must be upheld. And then secondly, is there a danger of... To me, you could argue that it's a question of how broadly or how narrowly do you view the issue that was at play here, and is there a danger of refining this too narrowly when, as I understand it, a key issue was prednisone, the prescribing of prednisone, and what precautions should be taken when prednisone is prescribed. It would seem that that could be an issue that cuts across particular specialties and maybe would be something that an endocrinologist would perhaps be the ideal person to testify. I would say two things in response to that. The first is, what is the legal standard applicable here in terms of what expertise the plaintiff's expert has to have to testify about that? And that is, under Minnesota law, undisputed that an expert witness must possess a practical knowledge of what is usually and customarily done by physicians under circumstances similar to those which confront the defendant. That's the Minnesota law, undisputed, plaintiff agrees to that, appellant agrees to that. In this case, Dr. Rosen, I asked him verbatim, do you have exactly what that standard says you have to have? And I said, the bottom line then is you do not have a practical knowledge of what is usually and customarily done by physicians under the circumstances similar to those of Mr. Wise in 2011 when he saw Dr. Osborne, and he answered, correct. I asked him, as to the practical knowledge of what is done in the setting when the rheumatologist, Dr. Osborne, saw him, what's usually and customarily done in that setting? You don't have knowledge of that either. He answered, correct. And I said, you cannot tell me what rheumatologists would do in this setting when Dr. Osborne saw Mr. Wise. He said, correct. I cannot tell you what most rheumatologists would do, and I said, it's because you have no experience with that, correct, and he answered, correct. Now, what I think your honor is going towards is, okay, what are the relevant circumstances? Do we need to pay attention to all of these? Well, first I'd say, look, the circumstances under that law, the circumstances that confronted the defendant, the key circumstances here where we're talking about a rheumatologist seeing a patient, the rheumatologist seeing this patient, the patient has been having serious problems. They've gotten worse over the summer to the point where he cannot walk well. He has balance problems. He can't sleep. His local doctors are at a loss to figure out what's going on. He comes to Mayo. He sees Dr. Osborne, the rheumatologist. In those circumstances, the diagnosis is not known. Dr. Osborne comes up with a three possible differential diagnosis, three different possibilities. That is something an endocrinologist has absolutely no experience with treating such patients. Dr. Rosen, the plaintiff's expert in this case, an endocrinologist whose treatment, his care deals almost entirely, he admits, with treating patients with osteoporosis as their diagnosis. I want to press you on that because I think the claim's different than maybe you're giving the plaintiff credit for, which is suppose, and I'm not saying this case, but suppose you have the world's leading expert on prednisone, maybe even the person who invented prednisone. Prednisone was invented a long time ago, but suppose that's the case. The world's leading expert says 100% of the time, there are no exceptions, 100% of the time, you supplement prednisone when it's three months or more. It doesn't matter if you're a rheumatology patient, a gastroenterology patient, just doesn't matter because it's unsafe. It'll kill you. It'll cause bone fractures, whatever the case may be. Why then do you need a, if it's a rheumatology patient, a rheumatologist to come in and say, well, you know, practically speaking, this is how I treat my patients. Why isn't it good enough to say 100% of the time, categorically, you need supplementation? There'd be two points I'd make. First, the standard of care by law is what a reasonably competent physician would do under those circumstances. If he has never dealt with those circumstances where prednisone is prescribed, not for a known diagnosis, prednisone is prescribed in large part to see what the reaction is. Something Dr. Rosen knows nothing about. To see, does it help at all? That will help determine what the diagnosis is. If it helps, at what dosage? What changes? We have a follow-up checkup. The very purpose of that is to see, okay, we have three possibilities. What was the response to the prednisone? What happened with it? Because we, as rheumatologists, are looking at three diagnoses that endocrinologists know nothing about, and we're using the prednisone to try to help us figure out what the purpose is, what the diagnosis might be, what the response was. This is something that this guy has never dealt with. The law is, what was it reasonable for the rheumatologist to do that? This guy doesn't know anything about most of these circumstances. That's true even if 100% of the time you supplement. That's what he says, 100%, but he doesn't know if that's true for a rheumatologist. The problem I'm having is that gets really, really close to what the Minnesota Supreme Court has said the standard is not, which is the standard does not require somebody with the same specialty to come in and testify. I agree. I think you can look at Kornfeldt, you can look at Ree Weavey-Arneson. Both are good examples. There's no question here that you don't need a person with the same expertise. If Dr. Rosen had come in and said, I'm not a rheumatologist, but I am consulted by rheumatologists when they are treating patients trying to figure out a diagnosis and they want to give prednisone to see if it helps them in the diagnosis to see what the response is, and when I'm consulted with them, this is what we do, this is what's done, this is the standard. He never said anything like that. That is, in the Ree Weavey case and in Kornfeldt, one of the two in Kornfeldt, Belito, was consulted. He wasn't a surgeon, but he was consulted by surgeons on what to do. He was allowed to testify by the Minnesota Supreme Court. The other, same page cited, Burke, the court says he's not allowed to testify because he's not in the same area and he wasn't consulted about it. Ree Weavey-Arneson, a case I know well, they had a gastroenterologist, the issue in the surgery, should you tie the bowel together or have a biliostomy. They didn't have a surgical expert, they had a gastroenterologist. The court said that's okay, and it's okay because he testified, I am consulted by surgeons, I'm involved in the surgery, I have knowledge about what they do and what their decision is, I know about what surgeon's standard of care is in that area. This guy, Dr. Rosen, had nothing like that. So you're really, the quarrel probably with the district court and your quarrel is the nature of the testimony, the no, no, no, I don't do these things. So even though opposing counsel is now saying he does consult with rheumatologists regularly, he needed to provide that practical knowledge when he was asked about it, or provide some evidence of that. Right. He had to provide some evidence of it, and what they're saying is nothing that goes to that. Grand rounds are nothing about consulting on cases. You walk around and you tell them what you know. There's no testimony from him whatsoever. And I asked him about that repeatedly. In fact, at one point he says, you know, maybe they respond to it differently. He was asked by plaintiff's counsel, well, if you increase it to 50, was that significant? He said it was from his perspective. Now again, on abuse of discretion, you have to take into account that there was also testimony from the defendant doctor who said 50 milligrams for rheumatologists is not a significant dose. But he then volunteered, Dr. Rosen did, when asked about that, he said, there might be a different concern as to, oh, this isn't responding the way I thought it would. Maybe he has something else, but I am not qualified to make that assessment. Page 269 of the transcript. He's admitting that under the circumstances where you've got to see the reaction, I'm not qualified to make that assessment. So there are all sorts of aspects. But the bottom line, you go to a rheumatologist and you say, we had rheumatology experts coming  They look at this and say, this met the standard of care. Oh, but we have an endocrinologist who's going to come in. The rheumatologist is saying, what do they know about it? Does he consult? No. Has he ever dealt with this? No. He says, no matter what, you always give it. He doesn't know how we practice. He doesn't know our standard of care. How can he testify about that? The answer is he can't. The second thing I'd say, Your Honor, to your concern is look at Stoll v. Huddleston, which is a decision by this court. And Stoll, it was really, I think, hits exactly your point. They tried the same thing. There the plaintiff, the claim had to do with loss of vision after orthopedic surgery. It's a rare complication called posterior ischemic optic neuropathy, PION. And the plaintiff had an expert who was an ophthalmic surgeon, not an orthopedic surgeon. And he wanted to testify against an orthopedic surgeon. And what he said was, what the plaintiff argued was, the district court said, no, he doesn't have the practical experience of what's done by physicians confronted with this because he's not an orthopedic surgeon. They tried the same argument effectively here. They said, it doesn't matter what the surgery is. If there's a risk of vision loss, and he deals with surgery where there's a risk of vision loss, you have to give informed consent about it. You have to know about it. So they tried saying, same thing. Doesn't matter what the specific area is. If there's a risk, you always have to do it. What did this court say in response? It rejected that argument. It said, after reviewing Minnesota case law, however, we can find no other negligent nondisclosure case or medical malpractice case, for that matter, in which the risk to be disclosed or the standard of care were defined using such generalities. So this court rejected the attempt, and I'm quoting again from the court, to generalize the applicable standard of care to an extent that it enables an otherwise unqualified witness to offer expert opinion. And that's exactly what we're talking about here. The effort in Stolbe-Huddleston was to say, take this one narrow point, and it applies no matter what, no matter what the doctor's area, so we don't have to have somebody in the same thing. He knows this one narrow point. The exact same argument is here. This court said, following Minnesota law, no, that's too general. You're allowing people in who don't know what's done under the circumstances confronting the defendant, who don't have the practical knowledge. Same thing. And it makes sense. You can't go in and say to someone, well, you committed malpractice because you didn't do what a person who never deals with the circumstances you're dealing with, who knows nothing about how rheumatologists prescribe things, doesn't know that this dose was unusual, doesn't know that from a rheumatologist's perspective, and there's evidence on the record as well that the district judge had, that, oh, bisphosphonates have their own side effects and it's not something you just give no matter what. It may be when they already have a diagnosis of osteoporosis, which is what Dr. Rosen deals with, which was not this patient's diagnosis. We don't know this patient's diagnosis to this day. So that's the big picture of it. And I would say that you've got then ultimately three things. You've got Minnesota law saying they have to have this practical knowledge, which this witness says he doesn't have. He admits that he doesn't meet the legal standard. I don't see how that can be an abuse of discretion, one. Two, you go through what he's doing. He admits he doesn't have it and he tries to just expand the argument now that it doesn't matter anything except prescription of prednisone. That's it. That was rejected in Huddleston, as it should have been, by this court for the same reason. It is not Minnesota law. You have to have knowledge of the circumstances relevant in the case. And three, I would say the circumstances relevant to the case really are, and that goes to the question, those are determined first by the district court, who has all the evidence in front of her. And she made a determination that under these circumstances, he did not have experience with the relevant circumstances facing the defendant doctor. That even if you may have reached a different decision, with her having the knowledge, having heard the testimony on the side effects, having heard all the rest of it, and her looking at this, I don't see how that can be, when the witness admits it, and when he doesn't have these experiences in so many ways, how that can be an abuse of discretion. So I'd say those three parts of it, ultimately you get down to abuse of discretion. This court's own decision in store. Did you ever see a situation where someone like this expert could say, well, I see it once the result of the misprescribing decision has been made, and here are the factors that are attached to each one of these. Would that be sufficient to be able to say, look, every time someone does not supplement at when you are giving X level of this drug, this is what happens. I would say no, and the reason is the witness wouldn't have knowledge about all the other cases where the rheumatologist are treating the patient without these problems. You say without these problems. Without whatever the side effects he's saying now that he sees in your hypothetical. Well, I think, isn't it the bone loss? Isn't that really what we're talking about here, which led to this particular? There's a lot of dispute over those things, but if that were it, then I would say there are all sorts of patients that the witness would not know about, the expert who doesn't see it from a rheumatology perspective, who get a dose like this or greater and never have any problem. So there are circumstances that are taken into account. It isn't an all or nothing. The witness doesn't have knowledge about the decisions and the factors that go into those determinations. In particular, how are you going to make a diagnosis? That's what the rheumatologist is facing, and the prednisone is one of the tools that helps them do that without the side effects of bisphosphonates when you may not even be on them for more than a week if they don't work. You don't know. You may be on something then, a medication added to the prednisone, when you don't know how long or what dose the prednisone will be. You'll know that at the follow-up appointment, which is what was scheduled until the plaintiff canceled it to go on a vacation. I'm out of time. Thank you. All right. Thank you, counsel. Mr. Ryberg, would you care to respond? And I'll give you two minutes to finish up. Yes, sir. Mr. Ryberg. I think the issue is how do you do it safely, not how you go about finding what the condition is before you make a judgment about the drug. In document 81, the question was asked at page 286, Dr. Rosen, in the course of your practice, are you familiar with the standard of care that applies to physicians prescribing prednisone to patients? Answer yes. You're familiar and knowledgeable about prescription of drugs like prednisone, are you? Answer yes. Next question. In the prescription of a drug like prednisone, is there a standard of care that applies to that? One that applies because of the medicine itself, irrespective of the doctor making the prescription for the medicine. Answer to that, yes. That's what the case is about. This esoteric business that I don't know how the guy's going to do on 12 versus 60 milligrams and so on, I may have to think about that, got nothing to do with this case. This case is giving him the 12 or the 50 or the 60 milligrams without supplementing. That's where the problem lies in the case, and that's why he has a broken back because of that, and the testimony by my experts was clear on that point. Kornfeldt stands for the proposition that the internist can testify about surgical matters as to suitability of the patient to submit to surgery, analogous to the endocrinologist Rosen testifying about not supplementing this guy for the treatment that he was getting. Stowell has nothing to do with this case, the eye case. That's an informed consent case. You're talking about somebody who's never done a back operation. He's asked questions about what's the informed consent operation and a back operation. That's far afield from this particular case. The judge had said a couple of times, as I pointed out at pages 301 and 307, this really is a matter that goes to weight, is really dispositive of the issue in this case, because what happened here was that the doctor erred in his belief that you didn't have to supplement and it would take a year for the supplement to work and you couldn't get hurt in less than that time. Mr. Wise proved otherwise respectfully. Thank you. Thank you for your argument, counsel. The case is submitted and court will render a decision in due course. With that, you may stand aside. Please call the next case. Bradley Harkey et al. versus WIPT et al.